UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

David Kircher,

      Plaintiff,

v.                          Case No. 04-72449

City of Ypsilanti, *et al.*,        Sean F. Cox
                                 United States District Court Judge

      Defendants.

_____/

## OPINION & ORDER
## DENYING LEAVE TO AMEND AND
## GRANTING DEFENDANTS' MOTION TO DISMISS

This 2004 case was reassigned to this Court in 2017, when the Honorable Gerald Rosen

retired. The case involves protracted state-court litigation between Plaintiff David Kircher, a

property owner in Ypsilanti, Michigan, and the City of Ypsilanti and several of its officials. The

case is currently before the Court on: 1) Plaintiff's motion seeking to file an amended complaint,

which Defendants oppose; and 2) a Motion to Dismiss filed by Defendants, that asserts multiple

grounds for relief. The motions have been briefed and the Court heard oral argument on April

12, 2018. For the reasons set forth below, the Court shall deny Plaintiff's motion seeking leave

to amend, and grant Defendants' motion to dismiss, because the constitutional claims that

Plaintiff wishes to pursue in this action are barred under the applicable preclusion doctrines.

## BACKGROUND

### A.     Procedural Background

Acting through counsel, George Ward, Plaintiff David Kircher filed this action on July 1,

2004, naming the following Defendants: 1) the City of Ypsilanti; 2) Cheryl Farmer, Mayor of Ypsilanti; 3) Charles Boulard, Building Inspector of Ypsilanti; 4) Jon Ichesco, Fire Marshall of Ypsilanti; 5) Robert Barnes, 6) Donald Shelton, Washtenaw County Circuit Court Judge; and 7) Timothy Connors, Washtenaw County Circuit Court Judge. The action was assigned to the Honorable Gerald Rosen.

Plaintiff filed a First Amended Complaint on July 9, 2004, against the same Defendants. (D.E. No. 3). This is the operative complaint and it contains four separate counts – none of which are titled.

Two Defendants, Judge Shelton and Judge Connors, filed an early Motion to Dismiss, based on judicial immunity and other grounds, that was granted by Judge Rosen. Thus, they are no longer in the case.

The remaining Defendants filed a Motion to Dismiss or Stay action on September 10, 2004. (D.E. No. 17 & 18).

On October 10, 2006, Judge Rosen issued an "Order Staying Case In Favor Of Parallel State Court Proceedings" (D.E. No. 37) wherein he "ORDERED that all proceedings in this case are STAYED until such time as the related state court actions have fully concluded, including any appeals that are pending or that the parties might elect to pursue." (*Id.*). Judge Rosen remanded the matter to state court under the *Younger* abstention doctrine.

Approximately ten years later, on November 9, 2016, Plaintiff filed a motion seeking to end the stay (D.E. No. 69), which this Court granted in an Order issued on May 12, 2017. (D.E. No. 78).

On October 4, 2017, Plaintiff, who is now represented by new counsel, filed a "Motion

for Leave to Amend Complaint and for Discovery" (D.E. No. 84). That motion is opposed by Defendants. Plaintiff attaches his proposed Second Amended Complaint as Exhibit A. It includes the same five Defendants but now has five separately-titled counts: 1) "Inverse Condemnation – Taking Of Property For Economic Rejuvenation and/or Economic Development" (Count I); 2) "Inverse Condemnation – De Facto Taking" (Count II); 3) "Inverse Condemnation – Unreasonable Delay In Acquiring Property" (Count III); 4) "Substantive Due Process" (Count IV); and 5) "Procedural Due Process" (Count V).

On November 7, 2017, Defendants filed Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). (D.E. No. 88).

**B.     Standard of Decision**

Plaintiff has filed a motion seeking leave to file his proposed Second Amended Complaint, which asserts that the same claims against the same Defendants. Plaintiff asserts that he wishes to file this amended pleading in order to clarify the claims (by asserting them in titled counts) and by including additional factual allegations as to proceedings that have occurred since the time that Plaintiff filed his last complaint. Defendants agree that it raises the same claims as raised in the First Amended Complaint (*see* D.E. No. 85 at Pg ID 1227).

Defendants oppose Plaintiff's motion on futility grounds. In addition, Defendants have filed a separate Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6).

Amendment of a complaint is futile when the proposed pleading would not permit the complaint to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005).

Accordingly, this Court must consider whether Plaintiff's proposed Second Amended

Complaint can withstand a motion to dismiss. If it can, the Court should grant Plaintiff's motion for leave to file it and deny Defendants' Motion to Dismiss. If it cannot, then the Court should grant Defendants' Motion to Dismiss, deny Plaintiff's motion for leave, and dismiss the case.

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College,* 259 F.3d 493, 502 (6th Cir. 2001).

Here, there have been extensive proceedings in the state court that are relevant to Plaintiff's claims and Defendant's Motion to Dismiss. What follows is the factual history, taken from the allegations in Plaintiff's proposed Second Amended Complaint, the orders and opinions entered in the state court case, and facts stipulated to by the parties.

## C.    Relevant Facts

Pursuant to this Court's directive, both Plaintiff and Defendants submitted statements of material facts, so that they could acknowledge the numerous facts that are not in dispute. (D.E. Nos. 91-28 & 95). The Court shall refer to those submissions as "Pl.'s Stmt." and "Defs.' Stmt.," followed by the corresponding paragraph number.

Plaintiff David Kircher is a graduate engineer of the University of Michigan, a licensed electrical mechanical contractor and licensed master electrician, and a former Ypsilanti City council member. (Pl.'s proposed Sec. Am. Compl. at ¶ 1).

Plaintiff's claims in this action relate to three state-court actions concerning three properties owned by Plaintiff in Ypsilanti, Michigan.

### 1.     The Cross Street Property

The "Cross Street Property," 510 W. Cross Street, is a residential apartment complex that Plaintiff purchased in the 1960's.  (Pl.'s proposed Sec. Am. Compl. at ¶ 46-47).  In 2000, Defendant Robert Barnes owned the remaining properties on the Cross Street block and Barnes's principal place of business was 520 W. Cross Street.  In 2000, Barnes made an offer to Plaintiff to buy the Cross Street Property, but Plaintiff refused to sell it to Barnes.  (*Id.* at  ¶¶ 48-49). Plaintiff alleges that, "[s]tarting in approximately 2001, Defendants intended to transfer the Cross Street Property from [Plaintiff] to Barnes for the purpose of making a better economic use of the property;" "[s]pecifically, the Defendants desired to transfer the Cross Street Property to Barnes to enable Barnes to turn the property into a sorority or fraternity house."  (*Id.* at ¶¶ 50-51).

On May 14, 2001, the City of Ypsilanti (the "City") and the Fire Marshal for the City, Jon Ichesco ("Ichesco"), filed a "Complaint for Nuisance Abatement and/or Raze the Building and Order to Show Cause" regarding the Cross Street Property.  (Pl.'s & Defs.' Stmts. at ¶ 1).  The Cross Street Complaint was filed under MCL 29.23, part of the Fire Prevention Code.  (*Id.* at ¶ 2).

On August 20, 2001, the circuit court entered an Order for Fire and Building Code Compliance.  (Pl.'s & Defs.' Stmts. at ¶ 3; see D.E. No. 91-9).  That "Order for Fire and Building Code Compliance Repairs" stated that, the "parties having appeared in Court for a Show Cause hearing," the Court was ordering certain relief and attached a list of 224 repair items.  It provided that a "valid certificate of occupancy must be obtained from the building inspection department before any unit in the building may be occupied."  It also stated, in Section G, that Plaintiff, "Harvey Hutchison, Jon Ichesco, will meet within two weeks to resolve as many issues as

possible with the understanding that the parties will litigate the rest at an evidentiary hearing on 08-30-01 at 2:00." (D.E. No. 91-9 at Pg ID 1776). That evidentiary hearing was adjourned, however, because the parties entered a stipulated order. (*See* D.E. No. 91-2 at Pg ID 1696).

The City requested, and the circuit court ordered, that the Cross Street Property be vacated. (Pl.'s & Defs.' Stmts. at ¶ 4).

On November 21, 2001, Harry Hutchinson, Director of the City's Department of Public Works, sent a letter to Kircher specifying repairs that needed to be made to the Cross Street Property before a certificate of occupancy would be issued. (D.E. No. 91-19 at Pg ID 1859). Although prior evidentiary hearings had been scheduled, they had not occurred for various reasons, including stipulated orders from the parties and a cancellation by the circuit court. On May 28, 2002, the circuit court held an evidentiary hearing, during which testimony was taken regarding the Cross Street Property. That evidentiary hearing was the only evidentiary hearing regarding the Cross Street Property prior to any appeals to the Michigan Court of Appeals. (Pl.'s & Defs.' Stmts. at ¶ 9).

On June 14, 2002, the circuit court entered an Order giving the City the exclusive right to repair the building and fire code violations at the Cross Street Property. (Pl.'s & Defs.' Stmts. at ¶ 10). The June 14, 2002 circuit court order specified five repairs to be made by the City. (*Id*. at ¶ 11).

On June 25, 2002, the City's Building Official, Charles Boulard, sent a letter to Kircher stating that it was responding to "the plethora of inspection requests that you have made of the Building Department over the last several weeks." (D.E. No. 91-18). The letter referenced requests relating to several properties. As to the Cross Street Property, it said:

Address:       510 W. Cross
Request:       Inspection of the chimney of the structure by Building Inspector
               Avram
Response:       Request cannot be honored.  It is my sincere belief that performing
               the requested inspection would be contrary to the spoken and
               written orders of the Court.

*(Id.)*.

On July 22, 2002, Kircher appealed the circuit court's June 14, 2002 order to the Michigan Court of Appeals.  (Pl.'s & Defs.' Stmts. at ¶ 13).

On November 21, 2002, the City hired Barnes & Barnes to make the five repairs enumerated in the June 14, 2002 order to the Cross Street Property. (Pl.'s & Defs.' Stmts. at ¶ 14).  Barnes charged Kircher $54,376.74 for those five repairs.  (*Id*. at ¶ 15).

After completing the five repairs enumerated in the circuit court's June 14, 2002 order, Barnes continued making additional repairs and renovations to the Cross Street Property. (Pl.'s & Defs.' Stmts. at ¶ 16).  As of November 14, 2003, Barnes claimed that the amount owed by Kircher for repairs at the Cross Street Property was $95,559.50. (Pl.'s & Defs.' Stmts. at ¶ 17). On November 14, 2003, Barnes filed a complaint to foreclose judicial lien on the Cross Street Property and to determine interests in real property. (Pl.'s & Defs.' Stmts. at ¶ 18).

On December 17, 2003, the City and Barnes filed a joint motion requesting authority from the circuit court to reconfigure the Cross Street Property into a sorority or fraternity house. (Pl.'s & Defs.' Stmts. at ¶ 19).

At a hearing in February of 2004, the attorney for the City stated that the purpose of the circuit court's order giving the City authority to make repairs to the Cross Street Property to get a

certificate of occupancy was intended to mean that the City had authority to make the property "economically viable."  (Pl.'s & Defs.' Stmts. at ¶ 20).

As of February 11, 2004, Barnes had demolished the interior of the Cross Street Property. (Pl.'s & Defs.' Stmts. at ¶ 21).

On February 11, 2004, the circuit court denied the City and Barnes' request to reconfigure the Cross Street Property into a sorority or fraternity house.  (*Id.* at ¶ 22).

Undeterred, on March 17, 2004, Barnes applied to the City for a special use permit to use the Cross Street Property as a sorority or fraternity house. (*Id*. at ¶ 23).

On April 27, 2004, the Court of Appeals remanded the case back to the trial court.  With regard to the Cross Street Property, the Court of Appeals stated: "the order does not provide for the trial court's approval of the amount charged to defendant for the repairs.  In light of the harsh consequences of defendant's failure to pay, the order must provide that charges to defendant shall be reviewed by the trial court to determine whether they are appropriate and reasonable before defendant is required to pay."  (*Id.* at ¶ 24).

On May 25, 2004, the City approved Barnes' request for a special use permit to use the Cross Street Property as a sorority or fraternity house. (*Id.* at ¶ 25).

On July 1, 2004, Plaintiff filed his Complaint in the United States District Court for the Eastern District of Michigan concerning constitutional violations regarding the Cross Street Property. (*Id.* at ¶ 26).  On July 9, 2004, Plaintiff amended his Complaint as of right to state constitutional claims regarding the Cross Street Property, the Perrin Property, and the Thompson Building.  (*Id.* at ¶ 27).

Barnes charged at least another $163,926.58 to Kircher between April 8, 2003 and

January 19, 2005 for repairs and renovations to the Cross Street Property. The circuit court did

not review the nature of the repairs, the plans, or the proposed costs, prior to the repairs or

renovations being made by Barnes.  No evidentiary hearing occurred regarding the $163,926.58

claimed to be due for repairs and renovations prior to Kircher's first appeal to the Michigan

Court of Appeals.  (Pl.'s & Defs.' Stmts. at ¶¶ 29-30).

After the Court of Appeals April 27, 2004 Order remanding the cases to circuit court, the

circuit court held an evidentiary hearing on July 22, 2004 for the repairs made to the Thompson

Building and Cross Street Property, together with an evidentiary hearing regarding the

foreclosure sales of each of those properties.  (*Id.* at ¶ 31).  The circuit court expressly stated that

it was not addressing any constitutional issues at the July 22, 2004 evidentiary hearing.  (*Id.* at ¶

32).

After testimony at the July 22, 2004 evidentiary hearing regarding the Thompson

Building, the evidentiary hearing was adjourned to December 10, 2004 to address the Cross

Street Property.  (*Id.* at ¶ 33).

On September 2 – 3, 2004, Kircher filed *England* Reservations in each of the City's

nuisance abatement cases and foreclosure cases.  (*Id.* at ¶ 34).

At an evidentiary hearing on December 10, 2004, Barnes, Jr. testified as follows

regarding the additional repairs and renovations that were made to the Cross Street Property by

Barnes: 1) "Barnes, Jr., testified that after these five initial repairs, Barnes & Barnes determined

that additional repairs were necessary, moved forward with these repairs, and billed Kircher for

the additional repair costs;" 2) "[Barnes, Jr.] testified that Barnes & Barnes had never asked the

trial court for permission to go beyond the five specific repairs listed in the trial court's June 14, 2002 order, and conceded that Kircher had never received an opportunity to contest or object to any of these additional repairs and modifications;" 3) "Whereas the original five repairs had been related to the abatement of alleged Fire Prevention Code violations, Barnes, Jr., indicated that the additional repairs were completed to bring the apartment building into compliance with Ypsilanti city ordinances and to make the building economically viable;" 4) "[Barnes, Jr.] indicated that although the trial court had denied the request to convert the property into a fraternity or sorority house, the additional work done by Barnes & Barnes was intended to facilitate modification of the property into a fraternity or sorority house in the future in the event that Barnes ultimately received ownership of the building." (Pl.'s Stmt. & Defs.' Stmt. at ¶ 35).

On January 19, 2005, the circuit court ruled that Kircher owed a total of $218,303.32 for repairs to the Cross Street Property. On February 4, 2005, the circuit court entered a judgment of foreclosure regarding the Cross Street Property. The circuit court found that a lien had attached to the Cross Street Property in the amount of $218,303.32. Barnes purchased the Cross Street Property at a sheriff's sale for $244,535.09. (Pl.'s & Defs.' Stmts. at ¶¶ 36-39).

Kircher appealed to the Michigan Court of Appeals. On January 9, 2007, the Michigan Court of Appeals made the following observation:

> Because the remand instructions were not followed, and the circuit court did not approve the costs of repairs and renovations before they were incurred, Kircher necessarily received no opportunity to contest the individual costs incurred by Barnes or to offer evidence in response to the individual proposed projects at the Thompson Building. We recognize that Judge Shelton held after-the-fact evidentiary hearings in an attempt to comply with our remand instructions, and that after these hearings he ultimately approved virtually all of the incurred costs. However, we cannot determine whether Judge Shelton's findings were clearly erroneous because we are not sufficiently presented with competing evidence, which surely would have been offered by the parties had this matter

10

proceeded as directed under our April 27, 2004 opinion. The circuit court's after-the-fact approval of the numerous expenses incurred in this matter does not afford us the opportunity for meaningful review that would have followed from an organized cost-by-cost determination in the court below. Moreover, we cannot omit mention of the real possibility that by reserving review of all expenses until after the repairs and renovations were already completed, Judge Shelton in effect preordained his decision to allow or disallow each individual expenditure. It is much less subjective to evaluate the propriety of proposed repairs before they are begun than after the work is finished and the costs are already incurred.

(Pl.'s & Defs.' Stmts. at ¶ 41). The Court of Appeals remanded the case in its January 9,

2007 Opinion with the following instructions regarding the Cross Street Property:

We vacate the judgment of foreclosure and invalidate the foreclosure proceedings to the extent that they involved the collection of expenses incurred solely under the municipal building and fire codes. We remand for the entry of an order terminating Ypsilanti's right to possession and to make necessary repairs at the time of the sheriff's sale, and for the following further proceedings.

On remand, the trial court shall determine whether each expense was incurred (1) to abate a violation of the Fire Prevention Code, or (2) to abate a violation of the Ypsilanti building and fire codes. For expenses falling into the second category, the court shall state with specificity which provision of the city codes authorized the charges. The trial court shall determine which expenses were properly incurred to abate violations of the Fire Prevention Code, and shall include these expenses in the amount of the foreclosed lien. The trial court shall then determine which expenses were properly incurred to abate violations of the Ypsilanti building and fire codes, and shall exclude these expenses from the lien amount as surplus. All costs properly incurred to abate violations of the Ypsilanti building and fire codes shall be paid out of this surplus, and any remainder left after payment of these expenses shall be disbursed to Kircher.

(*Id*. at ¶ 42).

In its January 9th Opinion, the Court of Appeals stated, "[i]n light of our resolution of

these consolidated appeals, we decline to address the constitutional issues raised by Kircher in

these cases." (*Ypsilanti Fire Marshal v. Kircher*, 273 Mich.App. 496, 533 (2007)). But in a

footnote to that sentence, the Court of Appeals ruled:

Relying on *Wayne Co. v. Hathcock*, 471 Mich. 445; 684 N.W.2d 765 (2004), Kircher cursorily suggests that his properties have been taken by Ypsilanti without just compensation. Even assuming the requisite state action could be demonstrated, we disagree with [Plaintiff]'s contention, which disregards the well-established nuisance exception to the prohibition on governmental takings. The federal and state constitutions both proscribe the taking of private property for public use without just compensation. The Takings Clause of the Fifth Amendment is substantially similar to the Takings Clause of the Michigan Constitution, and the two provisions should generally be interpreted coextensively. The nuisance exception to the prohibition on unconstitutional takings provides that because no individual has the right to use his or her property so as to create a nuisance, "the [s]tate has not 'taken' anything when it asserts its power to enjoin [a] nuisance-like activity." Indeed, "[c]ourts have consistently held that a [s]tate need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." Because Ypsilanti was exercising its legitimate police power to abate the alleged nuisances on Kircher's property, no unconstitutional taking occurred.

*(Id.).*

A later panel of the Michigan Court of Appeals considered that footnote a ruling on the taking issue, as it stated: "the majority of the issues raised by Kircher are merely a rehashing of issues raised in previous appeals before this Court such as his contentions regarding the trial court's lack of jurisdiction, . . . the award of attorney and receiver fees and the existence of a conspiracy between Ypsilanti and Barnses to effectuate an unconstitutional taking of Kircher's properties. As each of these issues has been addressed repeatedly in both the trial court and before this Court, we find no need to go into further or extensive detail regarding these claims. It is sufficient to note that since all of these issues have been previously addressed and ruled on they are precluded from reexamination by the law of the case doctrine." *Ypsilanti Fire Marshal v. Kircher*, 2011 WL 6187067 (Mich. App. 2011).

And the Michigan Court of Appeals has since cited to the 2007 decision to support the proposition that there is a nuisance exception to takings claims. *See Ligon v. City of Detroit*, 739N.W.2d 900, 908 n5, 276 Mich. App. 120, 132 (2007)("As the City points out, there is a well-recognized nuisance exception to the Takings Clause of the Fifth Amendment."); *Wayne Cty. Exec. v. Aggor,* No. 266183, 2007 WL 2067936, at *2 (Mich. Ct. App. July 19, 2007)("Indeed, "[c]ourts have consistently held that a [s]tate need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance.")

On remand from the Court of Appeals January 9, 2007 Opinion, the circuit court approved liens on the Cross Street Property in the amount of $211,159.27 at an after-the-fact evidentiary hearing. (Pl.'s & Defs.' Stmts. at ¶ 44).

Kircher appealed to the Court of Appeals three more times concerning the Thompson Building and the Cross Street Property. The first two appeals ended with remands to the circuit court for more clarification regarding the liens and the last appeal was denied. (*Id*. at ¶ 45).

## II.    The Thompson Building

On April 11, 2002, the City and Ichesco filed a "Complaint for Order to Show Cause, and for Immediate Appointment of Receiver" regarding the Thompson Building. (Pl.'s & Defs.' Stmts. at ¶ 46). On June 14, 2002, the circuit court entered an order regarding the Thompson Building which: 1) appointed Barnes as a receiver; 2) required that Barnes make the building "economically

13

viable and functional;" and 3) prohibited Plaintiff from entering the property. (*Id*. at ¶ 47).

Although the court had held a Show Cause hearing on May 28, 2002, no evidentiary hearing took place between April 11, 2002 and June 14, 2002.

On June 25, 2002, the City's Building Official, Charles Boulard sent a letter to Kircher refusing Kircher's prior request for reinspection of the repairs Kircher had made to the Thompson Building. (Pl.'s & Defs.' Stmts. at ¶ 50).

On August 17, 2002, Barnes published his development plans for the Thompson Building in the Ann Arbor News, with the article stating: "The younger Barnes said this week he and his father hope to restore the building and add six to eight luxury apartments on each of the top two floors, and put four or five commercial tenants on the street-level." (Pl.'s & Defs.' Stmts. at ¶ 51). Barnes Jr. stated that the Thompson Building "appears to be structurally sound" as of August 17, 2002. (*Id*. at ¶ 52).

On October 30, 2002, Lopez Engineering performed an inspection of the Thompson Building and, on November 6th it drafted a report wherein it found that "Considering the age of the building it is in reasonably good structural condition." That November 6, 2002 Inspection Report further stated that "[c]urrently, the building is not a danger to its occupants. The building is capable of supporting itself for several more years. Repairs are required, but evacuation of the occupants is not required in order for the repairs to be performed." (D.E. No. 91-17).

From June 14, 2002 to at least April 27, 2004, Barnes and the City had exclusive possession

of the Thompson Building and were permitted to repair and renovate the property with unlimited

authority. (Pl.'s & Defs.' Stmts. at ¶ 55)

On April 27, 2004, the Michigan Court of Appeals held:

> Defendant also argues that the order allows the receiver to spend and charge
> to defendant unlimited amounts of money for unspecified repairs. We agree. By
> giving the receiver the authority to make the Thompson building "economically
> viable," the order allows the receiver to make repairs beyond removing the hazards
> of which plaintiffs originally complained. Plaintiffs' reliance on the fire code does
> not support its argument that the broad scope of the order is appropriate. The quoted
> portion of the fire code only addresses hazards that endanger human life. It does not
> address the "economic viability" of the building. Accordingly, we reverse that
> portion of the June 14, 2002, order providing "that the Receiver needs to make the
> building economically viable and functional."

(Pl.'s & Defs.' Stmts. at ¶ 56).

On July 1, 2004, Plaintiff filed his Complaint in the United States District Court for the

Eastern District of Michigan concerning constitutional violations regarding the Cross Street Property.

Plaintiff amended his Complaint as of right to state constitutional claims regarding the Cross Street

Property, the Perrin Property and the Thompson Building. (*Id*. at 57-58).

The first evidentiary hearing regarding the Thompson Building was held on July 22, 2004,

after remand from the Court of Appeals. The July 22, 2004 evidentiary hearing concerned both the

repairs to the Thompson Building and the foreclosure of the Thompson Building. (*Id.* at 59-60).

At the July 22, 2004 evidentiary hearing regarding the Thompson Building, Kircher's

attorney made the following statement:

[Kircher's attorney]: I respectfully submit, Your Honor, that we first ought to do what the

Court said. Specify what were the fire hazards that existed back in 2001 with specificity that justified the continuation of this action. Then we'd like to go in and see the property. Mr. Kircher has not been [at the Thompson Building] for three years. We don't aren't ready for an evidentiary hearing without ever seeing whether they actually did what they said they were going to do.

(D.E. No. 91-7)

At the July 22, 2004 evidentiary hearing, the circuit court expressly stated that it was not addressing any constitutional issues. (Pl.'s & Defs.' Stmts. at ¶ 62).

On September 2 – 3, 2004, Kircher filed *England* Reservations in each of the City's nuisance abatement cases and foreclosure cases. (*Id*. at ¶ 63). Each of those submissions stated that Kircher "does hereby reserve his right to have his federal defenses and federal counter-claims ultimately resolved in federal court."

The Thompson Building was sold to successor receiver Beal at a sheriff's sale on May 11, 2006. (Pl.'s & Defs.' Stmts. at ¶ 65). By the time of the May 11, 2006 sheriff's sale of the Thompson Building, the lien on the property in favor of the receiver increased to $346,186.39. (*Id*. at ¶ 66).

On May 17, 2006, Stewart Beal, the successor receiver, published his plans to "convert the old structure into restaurants, shops, offices, and loft apartments." (*Id*. at ¶ 67).

In its January 9, 2007 opinion, the Court of Appeals held:

Nonetheless, to date the circuit court has never amended its original order or issued a new order to limit or otherwise narrow the scope of the receiver's authority. To make matters worse, the circuit court entered an order replacing the original receiver with a successor receiver on March 21, 2005--nearly eleven months after we issued our remand instructions in *Ypsilanti Fire Marshal*. The order appointing the

successor receiver made no mention of this Court's remand instructions, and in no way limited the authority or power of the successor receiver as required by this Court's directive. Instead, the circuit court left unchanged the framework under which the original receiver had operated, allowing the successor receiver to merely continue in the shoes of the original receiver and to carry on virtually unlimited repairs and renovations to the Thompson Building without first seeking judicial permission or approval.

. . . .

Despite this Court's explicit instructions, the circuit court permitted the receiver--and then the successor receiver--to continue unchecked and unsupervised, running up substantial costs and only seeking approval long after the charges were already incurred. Indeed, much of the confusion in these consolidated cases stems from the circuit court's failure to comply with our April 27, 2004 remand instructions. Our instructions were not intended as meaningless directives with no design, purpose, or reason. Instead, they were meant to bring the circuit court's existing orders into compliance with established legal rules and to effect the organized and systematic progress of this complex litigation.

. . . .

On remand, the trial court shall separate the individual costs incurred to abate violations of the Fire Prevention Code from the individual costs incurred to abate all other nuisances under the Ypsilanti building and fire codes.

. . . .

Kircher claims several errors with respect to the trial court's calculation of the lien amount, the trial court's foreclosure on the lien, and the trial court's order directing that the property be sold.

. . . .

When successor receiver Beal purchased the Thompson Building at the May 11, 2006, sheriff's sale, he took the property with full knowledge that further repairs and expenditures might be necessary to bring the property into complete compliance with Ypsilanti city codes. Having served as successor receiver of the property, Beal was clearly aware of the Thompson Building's physical condition at the time of sale. In short, when Beal purchased the property, the original reasons for the receivership ceased to exist. As record owner, Beal himself became responsible for any further necessary repairs. We conclude that the trial court abused its discretion by failing to terminate the successor receivership at the time of the May 11,

2006, sheriff's sale of the Thompson Building. Upon Beal's purchase of the property, there remained no further need for a receiver. Beal was fully aware at the time of sale that further repairs might be necessary to abate additional code violations, but purchased the property notwithstanding this knowledge. Moreover, as purchaser and owner, Beal was able, following the sale, to personally effectuate any further necessary repairs without the assistance of a court-appointed receiver. On remand, the trial court shall enter an order terminating the receivership as of May 11, 2006. All costs incurred beyond that date by the successor receiver—with the exception of necessary interest, tax, and insurance costs incurred between the date of sale and the end of the redemption period—are the responsibility of Beal as record owner of the Thompson Building.

*Ypsilanti Fire Marshal v. Kircher*, 273 Mich. App. 496, 535 & 541 (2007).

The Court of Appeals further held that an after-the-fact hearing was not equivalent to the right to challenge costs before they were incurred:

Because the remand instructions were not followed, and the circuit court did not approve the costs of repairs and renovations before they were incurred, Kircher necessarily received no opportunity to contest the individual costs incurred by Barnes or to offer evidence in response to the individual proposed projects at the Thompson Building. We recognize that Judge Shelton held after-the-fact evidentiary hearings in an attempt to comply with our remand instructions, and that after these hearings he ultimately approved virtually all of the incurred costs. However, we cannot determine whether Judge Shelton's findings were clearly erroneous because we are not sufficiently presented with competing evidence, which surely would have been offered by the parties had this matter proceeded as directed under our April 27, 2004 opinion. The circuit court's after-the-fact approval of the numerous expenses incurred in this matter does not afford us the opportunity for meaningful review that would have followed from an organized cost-by-cost determination in the court below. Moreover, we cannot omit mention of the real possibility that by reserving review of all expenses until after the repairs and renovations were already completed, Judge Shelton in effect preordained his decision to allow or disallow each individual expenditure. It is much less subjective to evaluate the propriety of proposed repairs before they are begun than after the work is finished and the costs are already incurred.

*Id.* at 533.

Again, that Opinion stated "[i]n light of our resolution of these consolidated appeals, we decline to address the constitutional issues raised by Kircher in these cases" but then included a footnote ruling no unconstitutional taking occurred. *Id*. at 533.

On remand from the Court's January 9, 2007 Opinion, the circuit court upheld all charges by the receiver at an after-the-fact-evidentiary hearing. (Pl.'s & Defs.' Stmts. at ¶ 71)

Kircher appealed to the Court of Appeals three more times concerning the Thompson Building and the Cross Street Property. The first two appeals ended with remands to the circuit court for more clarification regarding the liens and the last appeal was denied. (*Id.* at ¶ 72).

### III. The Perrin Property

On July 30, 2001, the City filed a "Complaint for Nuisance Abatement and/or Raze the Building and Order to Show Cause" regarding the Perrin Property. (Pl.'s & Defs.' Stmts. at ¶ 73). On November 22, 2001, the circuit court entered an order appointing Harry Hutchinson as receiver. (*Id*. at ¶ 74).

Although the court held a Show Cause hearing on September 21, 2001, no evidentiary hearing took place between July 30, 2001 and November 22, 2001. (*Id*. at ¶ 75).

On June 25, 2002 the City's Building Official, Charles Boulard sent a letter to Kircher refusing Kircher's prior request for reinspection of the repairs Kircher had made to the Perrin Property. (*Id*. at ¶ 76).

On July 12, 2002, Barnes was appointed as a successor receiver. (*Id*. at ¶ 77).

No evidentiary hearing was held between November 22, 2001 and July 12, 2002. (*Id*. at ¶ 78).

Kircher attempted to appeal the circuit court's orders to the Court of Appeals on August 2, 2002. But the appeal was dismissed by the Court of Appeals as premature on November 15, 2002 because the circuit court order appointing the receiver was not a final order. (Pl.'s & Defs.' Stmts. at ¶¶ 79-80).

Kircher filed a motion to terminate the receivership on December 4, 2002, which was denied by the circuit court on December 20, 2002. (*Id*. at ¶ 81).

A no progress notice was issued on August 26, 2003 and an order dismissing the case was entered on October 15, 2003. (*Id*. at ¶ 83).

On November 14, 2003, Barnes filed a complaint to foreclose the liens against the Perrin Property. (*Id*. at ¶ 84).

The case was reinstated on December 26, 2003 by *sua sponte* order. (*Id*. at ¶ 85).

Another no progress notice was issued by the circuit court on May 24, 2004. (*Id*. at ¶ 86).

On July 1, 2004, Plaintiff filed his Complaint in the United States District Court for the Eastern District of Michigan concerning constitutional violations regarding the Cross Street Property. On July 9, 2004, Plaintiff amended his Complaint as of right to state constitutional claims regarding the Cross Street Property, the Perrin Property and the Thompson Building. (*Id*. at ¶¶ 87-88).

A final dismissal of this state-court case for no progress was entered on July 12, 2004. (*Id*. at ¶ 89).

Kircher appealed the July 12, 2004 circuit court order to the Court of Appeals, but it was again dismissed by the Court of Appeals because it was not a final order. (*Id*. at ¶ 90).

On September 2 – 3, 2004, Kircher filed *England* Reservations in each of the City's nuisance abatement cases and foreclosure cases. (*Id*. at ¶ 91).

Kircher filed a motion to reinstate the case before the trial court for final adjudication of the matter so that he could appeal the decision. The circuit court denied Kircher's motion to reinstate the case, and the Court of Appeals affirmed the denial in its March 13, 2008 Opinion. (Pl.'s & Defs.' Stmts. at ¶¶ 92-93).

## ANALYSIS

In their Motion to Dismiss, Defendants challenge Plaintiff's claims in this action on numerous grounds. The Court need not reach them all.

### I.     The *Rooker-Feldman* Doctrine Does Not Apply Here.

Defendants first appear to assert that this Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine.

"The *Rooker-Feldman* doctrine," however, "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments *rendered before the district court proceedings commenced* and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (emphasis added). Thus, a court must consider whether each of those elements is met. *See Iannucci v. State*, 2017 WL 3951849 (6th Cir. 2017) (quoting *Exxon Mobil Corp*. and numbering the required elements, including the third element, that the state court judgment must have been "rendered before the district court proceedings commenced").

Accordingly, as Judge Rosen recognized in addressing a prior motion to dismiss in this case, Plaintiff's claims are not barred by the doctrine because the state-court actions remained pending when this federal case was commenced. (*See* D.E. No. 38 at Pg ID 925-28); *Exxon Mobil Corp., supra; Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)

(explaining that *Rooker-Feldman* doctrine did not apply because the state-court judgment at issue was issued nearly seven weeks after the plaintiff filed her federal case.).

As explained in *Exxon Mobil Corp.*, the limited *Rooker-Feldman* doctrine "does not otherwise override or supplant preclusion doctrine." *Exxon Mobil Corp.*, 544 U.S. at 284. That is, the doctrine does not support "the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains sub judice in a federal court." *Id*. at 292. Rather, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Id.* at 293.

That leads into other arguments presented by Defendants, that Plaintiff's claims in this action are barred by the preclusive effect of the state-court rulings and judgments.

## II.    Plaintiff's Constitutional Claims Are Barred By The Preclusive Effect Of The State-Court Rulings And Judgments.

"A federal court must give a state court judgment the same preclusive effect it would have in the courts of the rendering state." *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 744 (6th Cir. 2002). As such, as the parties recognize, the preclusive effect of the state court judgments at issue in this case must be determined by Michigan law. *See Buck v. Thomas Cooley Law Sch.*, 597 F.3d 812, 817 (6th Cir. 2010).

"Michigan recognizes two preclusion doctrines: res judicata (or claim preclusion) and collateral estoppel (or issue preclusion)." *Adams v. JPMorgan Chase Bank, N.A.*, 2017 WL 2819231 at * 2 (6th Cir. 2017).

### A.    Res Judicata (Claim Preclusion)

"The doctrine of res judicata is employed to prevent multiple suits litigating the same

cause of action." *Adair v. State*, 470 Mich. 105, 120 (2004). As explained by the Sixth Circuit, under Michigan law, a second, subsequent action is barred by res judicata when: 1) the prior action was decided on the merits, 2) both actions involve the same parties or their privies, and 3) the matter in the second case was, or could have been, resolved in the first. *AuSable River Trading Post, LLC v. Dovetail Solutions, Inc*., 874 F.3d 271, 274 (6th Cir. 2017). "Res judicata is applied broadly by Michigan courts, barring 'not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.'" *Id.*

Here, there does not appear to be any dispute as to the first two elements, as the state court actions were decided on the merits and involve the same parties. What is in dispute is the final element – whether the constitutional claims that Plaintiff wants to bring here in federal court were, or could have been, resolved in the state-court cases.

Plaintiff's papers reference his "claims" in the state-court action and assert that Plaintiff's "constitutional claims were not decided on the merits" in the state court. (Pl.'s Br. at 10). But as Plaintiff's counsel confirmed on the record at the April 12, 2018 hearing, Plaintiff did not assert any takings or due process counter-claims in the state-court action.

Again, res judicata "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Buck*, 597 F.3d at 817. The Court concludes that Plaintiff's claims are barred by res judicata because Plaintiff could have presented his takings and due process claims during the course of the protracted state-court litigation but he chose not to do so. Indeed, Judge Rosen's

October 10, 2006 Opinion & Order gave Plaintiff's Counsel a very clear warning that the constitutional claims he sought to assert in this action would very likely be barred by re judicata and/or collateral estoppel if he were to attempt to return to federal court after the conclusion of the state-court proceedings. (*See* D.E. No. 38 at Pg ID 934).

In seeking to avoid the application of res judicata, Plaintiff asserts that his constitutional claims could not have been brought in the state court because those actions were commenced in 2001 and 2002, and the "events giving rise to Plaintiff's constitutional claims arose after the state court proceeding commenced." (Pl.'s Br. at 8). It does not matter that Plaintiff could not have brought the takings or due process claims on the dates on which the cases began. "[U]nder Michigan law, a plaintiff has a duty to supplement her complaint with related factual allegations that develop 'during the pendency of' her state suit or have them barred by res judicata." *Buck*, 597 F.3d at 817. Plaintiff could have, and should have, raised any takings and/or due process claims during the course of the protracted state-court litigation.

## B.    Collateral Estoppel (Issue Preclusion)

Under Michigan law, issue preclusion applies when: 1) there is identity of parties across pleadings; 2) there was a valid, final judgment in the first proceeding; 3) the same issue was actually litigated and determined in the first action; 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001).

Again, the prior actions were decided on the merits, after the parties had the opportunity to present their arguments, and the cases involve the same parties. What is in dispute is whether the issue was determined in the state-court actions.

24

Plaintiff asserts that he "attempted to raise the constitutional issue to the state court" but the state court refused to consider it. (D.E. No. 91 at Pg ID 1682). To support that argument, Plaintiff directs the Court to the line in the 2007 opinion wherein the Court said, "In light of our resolution of these consolidated appeals, we decline to address the constitutional issues raised by Kircher in these cases." *Ypsilanti Fire Marshal v. Kircher*, 273 Mich.App. at 555. In a footnote to that sentence, however, the Michigan Court of Appeals nevertheless considered and rejected Kircher's constitutional takings argument:

> Relying on *Wayne Co. v. Hathcock*, 471 Mich. 445; 684 N.W.2d 765 (2004), Kicher cursorily suggests that his properties have been taken by Ypsilanti without just compensation. Even assuming the requisite state action could be demonstrated, we disagree with [Plaintiff]'s contention, which disregards the well-established nuisance exception to the prohibition on governmental takings. The federal and state constitutions both proscribe the taking of private property for public use without just compensation. The Takings Clause of the Fifth Amendment is substantially similar to the Takings Clause of the Michigan Constitution, and the two provisions should generally be interpreted coextensively. The nuisance exception to the prohibition on unconstitutional takings provides that because no individual has the right to use his or her property so as to create a nuisance, "the [s]tate has not 'taken' anything when it asserts its power to enjoin [a] nuisance-like activity." Indeed, "[c]ourts have consistently held that a [s]tate need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." Because Ypsilanti was exercising its legitimate police power to abate the alleged nuisances on Kircher's property, **no unconstitutional taking occurred.**
> *(Id.).*

*Id.* (emphasis added).

And a later panel of the Michigan Court of Appeals considered that footnote a ruling on the takings issue, as it stated: "the majority of the issues raised by Kircher are merely a rehashing of issues raised in previous appeals before this Court such as his contentions regarding the trial court's lack of jurisdiction, . . . the award of attorney and receiver fees and the existence of a

conspiracy between Ypsilanti and Barnses to effectuate an **unconstitutional taking** of Kircher's properties. **As each of these issues has been addressed repeatedly in both the trial court and before this Court,** we find no need to go into further or extensive detail regarding these claims. It is sufficient to note that since **all of these issues have been previously addressed and ruled** on they are precluded from reexamination by the law of the case doctrine." *Ypsilanti Fire Marshal v. Kircher*, 2011 WL 6187067 (Mich. App. 2011) (emphasis added).

In addition, the Michigan Court of Appeals has since cited to the 2007 decision to support the proposition that there is a nuisance exception to takings claims. *See Ligon v City of Detroit*, 739 N.W.2d 900, 908 n5, 276 Mich. App. 120, 132 (2007)("As the City points out, there is a well-recognized nuisance exception to the Takings Clause of the Fifth Amendment."); *Wayne Cty. Exec. v. Aggor,* No. 266183, 2007 WL 2067936, at *2 (Mich. Ct. App. July 19, 2007)("Indeed, "[c]ourts have consistently held that a [s]tate need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance.")

Accordingly, the Court concludes that issue preclusion applies as well.

### C.   Plaintiff's *England* Reservation Of Rights Argument Is Rejected.

In opposing Defendants' Motion to Dismiss, based on the preclusive effects of the state court judgments, Plaintiff asserts that he can avoid preclusion and may proceed with his federal claims because he filed an *England* reservation of rights in each of the three state-court cases.

In the case *England v. Louisiana State Bd. of Med. Exam'r's*, 375 U.S. 411 (1964), the "Supreme Court established a procedure by which a party, whose case is partially remanded to

the state courts pursuant to the **_Pullman_ abstention doctrine**,[1] may reserve the right to litigate the federal claims in the federal court." *Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 495 (6th Cir. 2001) (bolding added for emphasis).

As the Supreme Court has explained, *England* reservations of rights developed to address a very specific scenario – cases that "involve federal constitutional challenges to a state statute that can be avoided if a state court construes the statute in a particular manner." *San Remo Hotel, L.P. v. City and Cnty. of San Francisco*, 545 U.S. 323, 339 (2005).

Nevertheless, some courts, including the Sixth Circuit, expanded the use of *England* reservations of rights beyond that narrow group of cases, to other types of cases, including takings cases. *See, e.g., DLX, Inc. v. Kentucky*, 381 F.3d 511, 523 (6th Cir. 2004) (holding that a party's *England* reservation of federal takings claims in a state takings action will suffice to defeat claim preclusion in federal case, but declining to consider it if will suffice to defeat issue preclusion).

In 2005, however, the Supreme Court issued *San Remo Hotel*, which changed the landscape on this issue. The Court noted that the "purpose of the *England* reservation is not to grant plaintiffs a second bite at the apple in their forum of choice," and rejected the plaintiff's assertion they have a "right to vindicate their federal claims in a federal forum." *San Remo Hotel*, 545 U.S. at 342 & 346. The Court explained that "Congress has not expressed any intent to exempt from the full faith and credit statute federal takings claims. Consequently, we apply

---

[1] *"Pullman* abstention does not involve the abdication of federal jurisdiction, but rather, the postponement of its exercise, "which differentiates its from other forms of federal judicial abstention." *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017). *Pullman* abstention is appropriate in a scenario in which a "state-law question is unsettled" and is best decided by the state court. *Id.*

our normal assumption that the weighty interests in finality and comity trump the interest in giving losing litigants access to an additional appellate tribunal." *Id*. at 345. The Court recognized the practical reality that "a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts" and that most takings cases come to the Supreme Court only through writs of certiorari from state courts of last resort. *Id.* 347. But it nevertheless rejected the plaintiffs claim that it would be unfair to give preclusive effect to state-court takings proceedings that the plaintiffs did not chose:

> Moreover, this is not the only area of law in which we have recognized limits to plaintiffs' ability to press their federal claims in federal courts. See, *e.g., Fair Assessment in Real Estate Assn., Inc. v. McNary,* 454 U.S. 100, 116, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (holding that taxpayers are "barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts"). State courts are fully competent to adjudicate constitutional challenges to local land-use decisions. Indeed, state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations.

> At base, petitioners' claim amounts to little more than the concern that it is unfair to give preclusive effect to state-court proceedings that are not chosen, but are instead *required* in order to ripen federal takings claims. Whatever the merits of that concern may be, we are not free to disregard the full faith and credit statute solely to preserve the availability of a federal forum. The Court of Appeals was correct to decline petitioners' invitation to ignore the requirements of 28 U.S.C. § 1738. The judgment of the Court of Appeals is therefore affirmed.

*Id.* at 347-48.

As a result, following *San Remo Hotels*, courts have rejected the reservation of rights argument that Plaintiff makes here. *See, e.g., Knutson v. City of Fargo*, 2008 WL 879735 (D. N. Dakota 2008) ("In *San Remo Hotel*, the Supreme Court soundly rejected the notion that a

plaintiff could somehow reserve his claims or that preclusion doctrines do not apply in takings proceedings, leaving the [plaintiffs] with no claim that may be heard in federal court."); *Edwards v. City of Joneboro*, 2010 WL 2228444 (E.D. Ark. 2010) ("The Court's holding in *San Remo Hotel* squarely stands for the proposition that a land owner can not 'reserve' his federal constitutional taking claims in the state court action . . . instead, the land owner must assert and pursue his federal taking claims as part of that state court action. Otherwise, the preclusive effect of the state court judgment will bar the land owner from later coming into federal court to assert a federal taking claim.").

In opposing Defendants' Motion to Dismiss, based on the preclusive effects of the state court judgments, Plaintiff asserts that he can avoid preclusion and may proceed with his federal claims because he filed an *England* reservation of rights in each of the three state-court cases.

This argument is rejected for several reasons.

First, Judge Rosen *did not* remand this case to the state court under the *Pullman* abstention doctrine. Rather, he remanded it based upon the *Younger* abstention doctrine and that matters. "A district court may abstain under the *Younger* doctrine if three conditions exist: there are state proceedings that are (1) currently pending; (2) involve an important state interest; and (3) **will provide the federal plaintiff with an adequate opportunity to raise his or her constitutional claims**." *Nimer v. Litchfield Twp. Bd. Of Trustees*, 707 F.3d 699, 700 (6th Cir. 2013) (bolding added for emphasis).

"The rationale for allowing reservation of a federal claim in a state court proceeding following *Pullman* abstention in a federal court is thus not applicable to *Younger* abstention" and, therefore, "a federal plaintiff may not avoid preclusion by reserving in the state court its

federal claims following *Younger* abstention." *Temple of Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 183 (2d Cir. 1991); *see also Beltran v. California*, 871 F.2d 777, 783 n.8 (9th Cir. 1988) (Explaining that "when *Younger* abstention applies, federal plaintiffs cannot reserve their federal claim from state court adjudication for later decision by the federal court.") That is because, if "a federal plaintiff could avoid the preclusive effects of the related state court proceeding by reserving its federal claims after the federal court abstains under *Younger,* then the federal court would fail to give effect to the ability of the state court to resolve federal constitutional questions, thereby undermining one of the central purposes behind *Younger* abstention. Moreover, such an approach would result in at least partially duplicative proceedings, one of the problems that *Younger* abstention attempts to remedy." *Temple of Lost Sheep,* 930 F.2d at 183.

Accordingly, this reason alone warrants the rejection of Plaintiff's argument that he can avoid the preclusive effect of the state court judgments because of his *England* reservations of rights.

Second, the Supreme Court's decision in *San Remo Hotel* also forecloses Plaintiff's position that he can reserve his takings claim by virtue of an *England* reservation of rights, especially where the state court made a ruling on the takings issue.

Third, while some courts had extended *England* reservations to takings claims, Plaintiff has offered no authority that would indicate he can make such a reservation for due process claims and the Court has found no such authority.[2]

This Court therefore rejects Plaintiff's argument that he can now litigate his federal

---

[2]In addition, while Mr. Ward filed *England* reservation of rights in the state-court cases, they said he was reserving his "federal counter-claims" and, as noted above, Plaintiff never actually asserted any takings or due process counter-claims in the state-court cases.

claims in this action by virtue of having filed *England* reservations of rights in the state court cases.

## CONCLUSION & ORDER

For the reasons stated above, IT IS ORDERED that Plaintiff's motion for leave to file an amended complaint is DENIED and Defendants' Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: April 17, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 17, 2018, by electronic and/or ordinary mail.

s/Teresa McGovern
Case Manager Generalist